1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9

DAVID TORRES ESPARZA,                    CV F   07-00556 AWI DLB HC

10                      Petitioner,        FINDINGS AND RECOMMENDATION
                                           REGARDING PETITION FOR WRIT OF
11        v.                               HABEAS CORPUS

12                                         [Doc. 1]
     ROSANNE CAMPBELL,
13
                        Respondent.
14   _____/

15

16        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17   pursuant to 28 U.S.C. § 2254.

18                                    BACKGROUND

19        Following jury trial in the Stanislaus County Superior Court, Petitioner was convicted of

20   being a felon in possession of a firearm, in violation of California Penal Code section 12021,

21   subdivision (a)(1).[1]  In a bifurcated bench trial, the court found true four prior strike allegations

22   and three prior prison terms. (§§ 667, subd. (d), 1192.7, subd. (c), 667.5, subd. (b)).[2]  (Lodged

23   Doc. No. 1.)  Petitioner was sentenced to 25 years to life in state prison.  (CT 170.)

24        Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth

25   Appellate District.  (Lodged Doc. No. 13.)  On February 24, 2004, the Court of Appeal affirmed

26   _____

27        [1] All further statutory references are to the California Penal Code unless otherwise indicated.

28        [2] In addition, Petitioner was convicted of a misdemeanor offense of being in possession of a hypodermic
     syringe (Cal. Bus. & Prof. Code § 4140), and was sentenced to time served.  (Lodged Doc. No. 2, at 2.)

1

1   the judgment.  (Lodged Doc. No. 2.)

2          On April 2, 2004, Petitioner filed a petition for review in the California Supreme Court.

3   (Lodged Doc. No. 3.)  The petition was denied on May 12, 2004.  (Lodged Doc. No. 4.)

4          On June 21, 2002, Petitioner filed a petition for writ of habeas corpus in the Fifth District

5   Court of Appeal, which was denied on September 25, 2002.  (Lodged Doc. Nos. 5, 6.)

6          On April 20, 2005, Petitioner filed a petition in the Stanislaus County Superior Court,

7   which was denied on June 22, 2005.  (Lodged Doc. Nos. 7, 8.)

8          On February 6, 2006, Petitioner filed a petition again in the Fifth District Court of

9   Appeal, which was denied on May 25, 2006.  (Lodged Doc. Nos. 9, 10.)

10          On July 17, 2006, Petitioner filed a petition in the California Supreme Court, which was

11   denied on February 7, 2007.  (Lodged Doc. Nos. 11, 12.)

12          Petitioner filed the instant federal petition for writ of habeas corpus on March 22, 2007.

13   (Court Doc. 1.) Respondent filed an answer to the petition on December 6, 2007, and Petitioner

14   filed a traverse on December 27, 2007.  (Court Docs. 25, 27.)

15                              STATEMENT OF FACTS[3]

16          On March 8, 2000, [Petitioner] submitted a drug test pursuant to the
       conditions of his parole and tested positive for methamphetamine and morphine;
17       the amount of morphine was consistent with recent heroin use.
              On March 24, 2000, Parole Officer James Oliver went to [Petitioner's]
18       reported residence on Bethany Avenue in Turlock to arrest him for the parole
       violation. [Petitioner's] brother and father were at the house, and they said
19       [Petitioner] moved out and they didn't know where he was living.  Officer Oliver
       verified that [Petitioner] was no longer living at the Bethany Avenue residence,
20       and that he hadn't reported a new residence to the parole department. [Petitioner]
       was now wanted for both the positive drug test and absconding.
21              On April 7 or 8, 2000, Officer Oliver received a telephone call about
       [Petitioner's] whereabouts from a person who refused to identify himself.  The
22       caller referred to [Petitioner] as "Cricket," and said "'[y]ou need to arrest Cricket
       before he hurts somebody.  He needs to go home.'" The caller stated that
23       [Petitioner] could be at a residence on Orange Street in Turlock.  The caller didn't
       give the address but gave a general description of the residence.  Officer Oliver
24       recognized the caller's voice as [Petitioner's] brother based on their prior
       conversations.  Officer Oliver investigated the tip and determined the residence
25       described by the anonymous caller was 429 ½ South Orange.
              On the morning of April 11, 2000, Officer Oliver went to the South

26

27   _____
       [3] The Court finds the Court of Appeal correctly summarized the facts in its February 24, 2004 opinion.
28   (Lodged Doc. No. 2). Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth
       Appellate District.

                                            2

Orange residence with other officers from the parole department and the Turlock Police Department. The residence was a two-story building with a separate entrance for an upstairs apartment. The officers repeatedly knocked on the upstairs entrance and the door was finally answered by Caroline Lomoljo. Officer Oliver explained he was looking for [Petitioner] and believed he lived there. Lomoljo hesitated and eventually said that [Petitioner] was asleep in a bedroom, and she allowed the officers to enter. Lomoljo directed the officers to a closed interior bedroom door. They knocked on the closed bedroom door and did not receive a response. The officers entered and found [Petitioner] asleep on the bed. [Petitioner] was taken into custody without incident.

Parole Officer Celso Anacleto searched the bedroom and found nothing on the bed. There was a "Wilson" duffle bag inside a baby crib in the corner of the bedroom. The bag was unzipped and open, and it had been placed on top of baby clothes in the crib. Officer Anacleto looked inside the open bag and immediately saw an unloaded .357 magnum handgun. The handgun was inside the duffle bag but placed on top of men's clothing and underwear. Officer Anacleto alerted the other officers about the gun and asked [Petitioner] if it was his bag. [Petitioner] said no, and Anacleto asked if anything in the bag belonged to him. [Petitioner] replied "'some of the stuff in there is mine, but the bag's not mine.'"

The officers conducted an inventory search of the duffle bag and found a small black vinyl bag inside, which contained six .357 magnum cartridges and three syringes. The small bag also contained [Petitioner's] identification card, letters addressed to him at the Bethany Avenue residence, and several articles of men's clothing. There was a basket hanging from a curtain rod in the bedroom, and there were 12 syringes in the basket. There were no usable fingerprints on the handgun.

Officer Anacleto asked Caroline Lomoljo who lived in the bedroom where [Petitioner] had been sleeping. Lomoljo replied that [Petitioner] was the only person who stayed in that room. Anacleto asked if she knew whom the duffle bag belonged to, and Lomoljo replied it belonged to [Petitioner].

As the officers escorted [Petitioner] from the apartment, Rudy Perez and his girlfriend, Hilda Ramirez, arrived and said they lived there. Officer Oliver informed Rudy and Hilda about [Petitioner's] arrest and that they found a gun. Oliver testified Rudy and Hilda acted shocked and surprised about a gun, as if they didn't know about the weapon.

**Additional Trial Testimony**

Caroline Lomoljo testified she had lived at the South Orange apartment for one year. Rudy Perez and Hilda Ramirez also lived there with their child, and [Petitioner] arrived just a few days before he was arrested. [Petitioner] slept in one bedroom, Rudy and Hilda slept in the other bedroom, and Lomoljo slept in the living room. [Petitioner] usually left his bedroom door open. She never saw Rudy or Hilda sleep in [Petitioner's] room.

Lomoljo testified that on the morning that [Petitioner] was arrested, she was at the apartment along with [Petitioner], Rudy, Hilda, and the baby. She never saw Rudy or Hilda enter [Petitioner's] room that morning. Rudy and Hilda left the apartment and Lomoljo remained to watch the baby. [Petitioner] was asleep in his room and she never saw him get up or leave his room. The police arrived about an hour after Rudy and Hilda left.

Lomoljo was impeached with her prior conviction for credit card fraud. She also admitted using heroin, which she purchased from Hilda. Hilda and Rudy also used heroin, and Hilda kept syringes in her bedroom. Lomoljo never saw [Petitioner] or Rudy with a gun, and she didn't know there was a gun in the apartment. Lomoljo testified that a lot of drug users stayed at the apartment to use narcotics and stay high.

Manuel Esparza, [Petitioner's] brother, admitted he called Officer Oliver

3

with the tip about [Petitioner's] whereabouts. [Petitioner] had moved from the family residence and Manuel learned [Petitioner] was staying at the South Orange apartment. Manuel knew [Petitioner] was addicted to heroin and he was pretty sure [Petitioner] was using drugs again. Manuel testified [Petitioner] used to hang out with Rudy Perez at the family residence, and Manuel believed Rudy also used heroin.

Manuel testified [Petitioner] and Rudy visited Manuel's workplace after [Petitioner] moved out of the family residence. [Petitioner] worked outside while Rudy went inside and talked to Manuel. Rudy produced an automatic handgun and a resolver from the front and back of his waistband and placed the weapons on a table. Rudy told Manuel that [Petitioner] was sleeping with his girlfriend, Hilda, and asked Manuel to talk to [Petitioner]. Rudy looked angry, upset, and confused. Manuel got mad at Rudy and told him to put away the guns and leave. [Petitioner] and Rudy left together as friends, and Manuel was upset because he felt Rudy had just threatened him.

Manuel testified he contacted Officer Oliver after Rudy Perez's visit because he was concerned for [Petitioner's] safety. He also wanted [Petitioner] to get off drugs and not to get involved in anything more serious. Manuel testified he made two telephone calls to Officer Oliver and identified himself as [Petitioner's] brother, but asked Oliver not to disclose his identity to anyone. Manuel testified he never referred to [Petitioner] as "Cricket" during thee phone calls, but he told Oliver where [Petitioner] was staying because he didn't want [Petitioner] to be harmed. Manuel didn't expect [Petitioner] to be charged with possession of a firearm and didn't want [Petitioner] to go to jail for lief, "and now he is." Manuel [knew] for a fact" [Petitioner] didn't have a gun and he had never seen [Petitioner] with a gun. An investigator later showed Manuel a photograph of the gun found in the duffle bag, and Manuel said it was one of the weapons which Rudy Perez pulled from his waistband and showed him.

At trial, Officer Oliver testified that he received only one telephone call from a person who he believed to be [Petitioner's] brother. The caller referred to [Petitioner] as "Cricket," and never identified himself as Manuel Esparza. The caller wanted their conversation to be confidential. Oliver, however, recognized the caller's voice based on his prior conversations with Manuel.

**Defense Evidence**

A defense investigator testified that he interviewed Rudy Perez in the Merced county jail and showed him a photograph of the gun recovered from the black duffle bag in [Petitioner's] bedroom. Rudy initially said he didn't recognize the gun and seemed apprehensive because he wanted to help [Petitioner], but he was worried about getting in trouble himself. Rudy asked the investigator to keep their conversation confidential, and the investigator said that he would have to inform the defense attorney about the information. Rudy then admitted the .357 magnum was his weapon, and said he obtained it from either his uncle or his girlfriend's uncle. The investigator advised Rudy that this information would be disclosed to the prosecutor.

Hilda Ramirez testified she and Rudy Perez rented the South Orange apartment and lived there with their child. Caroline Lomoljo also lived there. Hilda and Rudy slept in one bedroom, and [Petitioner] occasionally stayed there and used the extra bedroom. Hilda and Rudy used the extra bedroom for storage, and Rudy kept things in that room. Hilda testified Rudy and [Petitioner] were friends, and they both used heroin. Hilda also used heroin, and Caroline supplied her with the narcotics. At the time of trial, Hilda had stopped using heroin and was taking methadone.

Hilda testified she left the apartment with Rudy on the morning [Petitioner] was arrested, and they returned just as the officers were leaving with [Petitioner]. The officers informed them that [Petitioner] had a gun in the duffle

4

bag. Hilda testified the .357 magnum found in the "Wilson" black duffle bag was her uncle's weapon. Rudy kept the gun in their bedroom closet inside a black "LA Gear" duffle bag. Rudy hadn't paid her uncle for the gun yet, and it was supposed to stay in the closet until the payments were made. Hilda admitted [Petitioner] kept his clothes in a similar black duffle bag, but she had never seen [Petitioner] handle the .357 magnum or any other gun. Hilda had last seen the gun in her bedroom closet a few days before [Petitioner] was arrested, but the closet wasn't locked and everyone had access to it.

Hilda admitted she had a sexual relationship with [Petitioner] and became pregnant with his child. Hilda believed Rudy didn't know about her pregnancy before [Petitioner] was arrested. However, Rudy and Hilda frequently argued about her relationship with [Petitioner] before he was arrested. After [Petitioner] was arrested, Rudy beat Hilda and she suffered a miscarriage.

Hilda testified that she was approached by Minnie Britt before trial, who told her that [Petitioner] wanted her to testify on his behalf. Hilda told Minnie she wouldn't lie. Hilda never told Minnie that Rudy planted the handgun in [Petitioner's] duffle bag.

Minnie Britt testified that she knew both Rudy Perez and [Petitioner]. She had seen Rudy carry handguns and revolvers on several occasions. She believed she had seen Rudy carry the .357 magnum in his waistband on one occasion. Rudy, Hilda, and [Petitioner] lived together, and Rudy sold heroin. Minnie testified about a conversation she had with Hilda after [Petitioner] was arrested. Hilda stated [Petitioner] had been arrested for having a gun in the apartment, and Rudy had someone make a call which led to [Petitioner's] arrest. Hilda said Rudy knew about [Petitioner's] relationship with Hilda and that she might be pregnant with [Petitioner's] child. Rudy promised to get even with [Petitioner] for not respecting him. Hilda said that Rudy planted the gun in [Petitioner's] bag to get even with him, and Rudy alerted her to be ready to leave that morning before the police arrived. As Hilda and Rudy left the apartment, Hilda looked back and saw the police. Hilda told Minnie she was afraid of Rudy and didn't want to testify for [Petitioner]. Minnie was impeached with her admitted heroin addiction and several prior narcotics convictions.

Rebuttal Evidence

The prosecution called Hilda Ramirez as a rebuttal witness, and she testified that she never told Minnie that Rudy planted the gun in [Petitioner's] possessions. Instead, Minnie approached Hilda and asked her if she thought Rudy set up [Petitioner]. Minnie thought Rudy set up [Petitioner] and wanted Hilda to believe that, but Hilda never told her that Rudy planted the gun. Hilda told her that it wasn't Rudy's style to do something like that. Hilda believed Rudy was "all messed upon on some pills" and forgot where he placed the gun.

Hilda testified that she had last seen the gun a few days before [Petitioner] was arrested. Rudy was handling the gun and going to place it under their mattress. Hilda told Rudy their baby could reach the gun under the mattress, and told him to put it away in their bedroom closet. Rudy wrapped the gun in an old diaper bag and placed it in a duffle bag. He put the duffle bag under some papers in the far corner of their bedroom closet. Hilda testified [Petitioner] wasn't present when they put away the gun and she believed [Petitioner] didn't know where the gun was stored. Hilda testified that a couple of days before [Petitioner] was arrested, her uncle's friend arrived to pick up the gun but it wasn't in the bag or the closet. "And Rudy . . . was messing around with some pills and he was getting messed up a lot. I guess he couldn't remember what he had did with it." Hilda never again saw the gun and didn't know where it was.

It was stipulated that [Petitioner] was a felon, Rudy and Hilda were the tenants of the apartment, and Rudy had prior convictions for residential burglaries, which were offenses of moral turpitude.

1  (Lodged Doc. No. 2, Opinion, at 2-9.)

2  DISCUSSION

3  A.    Jurisdiction

4          Relief by way of a petition for writ of habeas corpus extends to a person in custody

5  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

6  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

7  529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

8  violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

9  out of the Stanislaus County Superior Court, which is located within the jurisdiction of this

10  Court.  28 U.S.C. § 2254(a); 2241(d).

11          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

12  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

13  enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

14  F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

15  Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

16  1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

17  (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

18  petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

19  B.    Standard of Review

20          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

21  custody pursuant to the judgment of a State court only on the ground that he is in custody in

22  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

23          The AEDPA altered the standard of review that a federal habeas court must apply with

24  respect to a state prisoner's claim that was adjudicated on the merits in state court.  Williams v.

25  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

26  will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

27  to, or involved an unreasonable application of, clearly established Federal law, as determined by

28  the Supreme Court of the United States;" or "resulted in a decision that was based on an

6

1    unreasonable determination of the facts in light of the evidence presented in the State Court

2    proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 123 S.Ct.1166 (2003) (disapproving of

3    the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

4    Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

5    because that court concludes in its independent judgment that the relevant state-court decision

6    applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

7    omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

8           While habeas corpus relief is an important instrument to assure that individuals are

9    constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

10   (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

11   criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

12   Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

13   factual determinations must be presumed correct, and the federal court must accept all factual

14   findings made by the state court unless the petitioner can rebut "the presumption of correctness

15   by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

16   S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

17   110 F.3d 1380, 1388 (9th Cir. 1997).

18   C.    Trial Court's Response to Jury's Inquiry Regarding Definition of "Constructive
          Possession"
19

20          Petitioner contends that the trial court improperly responded to the jury's questions

21   regarding the definition of "constructive possession" and that the failure to clarify this term for

22   the jury caused them to be confused, warranting a reversal of his conviction.  (Petition, at 9-11.)

23          Petitioner presented this claim to the California Court of Appeal and California Supreme

24   Court.  Because the California Supreme Court summarily denied the petition, this Court "looks

25   through" that decision and presumes it adopted the reasoning of the California Court of Appeal,

26   the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797,

27   804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look

28   through" presumption that higher court agrees with lower court's reasoning where former affirms

                                                  7

1    latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000)

2    (holding federal courts look to last reasoned state court opinion in determining whether state

3    court's rejection of petitioner's claims was contrary to or an unreasonable application of federal

4    law under § 2254(d)(1)).

5         While the jury was deliberating, a note was submitted to the court which requested to

6    "[P]lease define 'constructive possession.'" The trial court met with both counsel off the record

7    and responded to the question in writing stating "'[C]onstructive possession' is defined in the

8    jury instructions."  Approximately an hour thereafter, the jury submitted the following question:

9    "Would a felon be charged for possession of a firearm if the firearm was found any where in the

10   home and not in his personal belongings?  Does this question fall under 'constructive

11   possession.'?"  (CT 133.)

12        After conferring with both counsel, the trial court responded in writing stating:

13            The first question appears to be a hypothetical, and the Court cannot
        answer a hypothetical question.

14            The jury instruction says "'[C]onstructive possession' does not require
        actual possession, but does require that a person knowingly exercise control over

15      or the right to control a thing, either directly or through another person or
        persons."

16            It is your duty to apply the law to the facts of this case.

17   (CT 106, 133-134.)

18        A jury returned a verdict of guilty approximately an hour thereafter.  (CT 106.)

19        On August 9, 2001, Petitioner filed a motion for a new trial claiming the court erred in its

20   responses to the two questions presented by the jury.  (CT 124-127.)  The prosecution opposed

21   the motion.  (CT 128-134.)  On August 24, 2001, the trial court denied the motion.  In reaching

22   its decision, the Court reasoned that the responses were intended to be neutral and were done in

23   writing and with the consent of both counsel.  (Supp. RT 11-12.)  With regard to the argument

24   that the definition of "constructive possession" as defined by CALJIC No. 12.44 was confusing,

25   the trial court found the issue to be more appropriately decided by the Court of Appeal.  (RT 12.)

26        Section 1138 provides:

27            After the jury have retired for deliberation, if there be any disagreement
        between them as to the testimony, or if they desire to be informed on any point of

28      law arising in the case, they must require the officer to conduct them into court.

Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called.

1.   Procedural Default

Initially in denying Petitioner's claim, the appellate court stated:

[Petitioner] apparently agreed with the court's proposed response to the jury's second set of questions.  The reporter's transcript herein does not contain the court's discussion with the parties about the jury questions.  At the hearing on the new trial motion, however, the court noted that it discussed the proposed responses with the parties and no one objected to the court's final decision on how to answer the jury's first and second set of questions. [Petitioner] did not disagree with the court's recollection of their discussion, and has never asserted that the court's responses were given over his objections.  Where, as here, [Petitioner] consents to the trial court response to jury questions during deliberations, any claim of error with respect thereto is waived. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193; *People v. Bohana* (2000) 84 Cal.App.4th 360, 373; *People v. Kageler* (1973) 32 Cal.App.3d 738, 746.)

(Lodged Doc. No. 2, Opinion, at 18.)

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

In this case, the Court of Appeal found that Petitioner's claim was waived because he not only failed to make a timely objection to the trial court's response to the jury inquiry, but he also failed to request appropriate clarifying or amplifying language.  (Lodged Doc. No. 2, Opinion, at 18-19.)

The Ninth Circuit Court of Appeals has determined that the "contemporaneous objection rule" is an adequate procedural bar.  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981); Rich v. Calderon, 187 F.3d 1064, 1070 (9th Cir. 1999) (court declined to review several claims of

1  prosecutorial misconduct because claims were defaulted by failing to make contemporaneous

2  objections and the appellate court invoked the procedural bar to their consideration). Respondent

3  has adequately pled the existence of a procedural bar, and Petitioner has not demonstrated cause

4  for failing to contemporaneously object to the trial court's handling of hte jury's request for a the

5  definition of "constructive possession."  In fact, as stated by the appellate court, Petitioner agreed

6  to the trial court's response to the jury's inquiry on two separate occasions.  (SRT 11-12; Lodged

7  Doc. No. 2, Opinion, at 18-19.)  Petitioner has failed to demonstrate actual prejudice or that a

8  fundamental miscarriage of justice will result if this claim is defaulted.  However, even if the

9  Court were to find the claim not procedurally defaulted, for the reasons explained *supra*,

10  Petitioner's claims fails on the merits under § 2254(d).

11          2.    <u>Merits of Claim</u>

12          A challenge to a jury instruction solely as an error under state law does not state a claim

13  cognizable in a federal habeas corpus action.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).

14  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

15  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

16  process.  <u>See</u> <u>id</u>. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

17  must be considered in the context of the instructions as a whole and the trial record.  <u>Id</u>.  The

18  court must evaluate jury instructions in the context of the overall charge to the jury as a

19  component of the entire trial process.  <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982)

20  (*citing* <u>Henderson v, Kibbe</u>,  431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined

21  that the instruction violated the petitioner's right to due process, a petitioner can only obtain

22  relief if the unconstitutional instruction had a substantial influence on the conviction and thereby

23  resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710

24  (1993) (whether the error had a substantial and injurious effect or influence in determining the

25  jury's verdict.). <u>See</u> <u>Hanna v. Riveland</u>, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

26  demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

27  attack on the constitutional validity of a state court's judgment is even greater than the showing

28  required to establish plain error on direct appeal." <u>Id</u>.

1    A trial judge has a duty to respond to an inquiry from the jury requesting clarification and

2    such a response must be made with sufficient specificity so as to eliminate the jury's confusion.

3    See Beardslee v. Woodford, 358 F.3d 560, 574-575 (9th Cir. 2004).  The trial judge is afforded

4    wide discretion in charging the jury, and this discretion is also given to the judge's response to a

5    question from the jury.  Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003).  If the original

6    instruction was correct and if, when responding to a jury question, the judge directed the jury to a

7    precise paragraph that answered the question clearly, this was sufficient under the Constitution.

8    Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Also, a jury is presumed to follow its instructions

9    and is also presumed to understand a judge's answer to a question.  Id. at 234.

10    Petitioner concedes that the trial court was reasonable in its response to the jury's first

11    question, which informed them the definition was contained in the jury instructions.  Petitioner

12    claims the trial court violated section 1138 by responding to the jury's second portion of the

13    question regarding the definition of constructive possession.  The last reasoned opinion of the

14    California Court of Appeal that the trial judge adequately responded to the question asked by the

15    jury is not contrary to or an unreasonable application of the clearly established due process law,

16    nor is it based on an unreasonable determination of the facts of this case.

17    The trial court properly informed the jury that the first part of the question posed an

18    improper hypothetical that the court could not answer, and the second portion was properly

19    addressed by restating the definition of constructive possession as defined by CALJIC No. 12.44.

20    The jury was properly advised that it was up to them to decide whether the factual circumstances

21    of the present case, not the hypothetical scenario, constituted "constructive possession."  The

22    pivotal issue in this case was whether Petitioner knowingly and intentionally possessed the

23    weapon.  Petitioner's defense was that even though the gun was found inside a duffle bag which

24    contained some of his personal belongings, Rudy planted the gun there and called the police to

25    get him in trouble.  (Lodged Doc. No. 2, Opinion, at 20; see RT 436-437, 441-444.)  CALJIC

26    No. 12.44, as given to the jury, advised the jury that Petitioner could not be convicted based on

27    his proximity to the gun; rather, it had to be determined that Petitioner had knowledge of the

28    presence of the gun and either exercised direct physical control over the gun or knowingly

1    exercised control over or the right to control the gun.  The jury was properly instructed as to the

2    requisite intent for the offense which did not require an intent to violate the law.  (CT 95;

3    CALJIC No. 3.30.)

4         Moreover, even if the trial court erred in its response, Petitioner cannot demonstrate that

5    such error had a "substantial and injurious effect or influence in determining the jury's verdict"

6    as defined by <u>Brecht v. Abrahamson</u>, 507 U.S. at 637.  Petitioner's defense at trial that the gun

7    was planted in his bag by Rudy in an attempt to get him in trouble was undermined by officer

8    Oliver's testimony that he recognized the anonymous tipster's voice as that of Petitioner's

9    brother, who confirmed that he called officer Oliver to report Petitioner's whereabout. **(**<u>See</u> RT

10   436-437, 441-444.**)**  In addition, Claudia Lomoljo testified that neither Rudy nor Hilda entered

11   Petitioner's room on the morning of his arrest, and Petitioner had been asleep that entire morning

12   until the police arrived. **(**RT 157, 159.)  Based on the foregoing, the trial court's response to the

13   jury's question did not have a substantial and injurious effect on the verdict, and habeas corpus

14   relief is foreclosed.

15   D.    <u>Instructional Error</u>

16        Petitioner contends that the trial court improperly instructed the jury with CALJIC No.

17   17.41.1 because that instruction confused the jury and effected the jury deliberations in an

18   adverse manner.

19        As with the preceding claim, Petitioner presented this claim to the California Court of

20   Appeal and California Supreme Court, and this Court looks to the last reasoned state court

21   opinion of the Court of Appeal.  (Lodged Doc. Nos. 2, 3.)

22        As instructed to the jury, in this case, CALJIC No. 17.41.1 states:

23            The integrity of a trial requires that jurors at all times during their
              deliberations conduct themselves as required by these instructions.  Accordingly,
24            should it occur that any juror refuses to deliberate or expresses an intention to
              disregard the law or to decide the case based on penalty or punishment or any
25            other improper basis, it is the obligation of the other jurors to immediately advise
              the Court of the situation.
26
     (CT 97; CALJIC 17.41.1.)
27
          In order to obtain federal collateral relief for errors in the jury charge, a petitioner must
28

1   show that the ailing instruction by itself so infected the entire trial that the resulting conviction

2   violates due process. <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991).  Even if it is determined that

3   the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if

4   the unconstitutional instruction had a substantial influence on the conviction and thereby resulted

5   in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

6          In this case, there is nothing in the record which supports Petitioner's allegation. There

7   was no report of a juror refusing to deliberate or disregarding the law. There was no jury

8   deadlock and no holdout juror.  There is further no evidence that deliberations were improperly

9   chilled, that majority jurors improperly imposed their will on the minority, or that Petitioner was

10  denied his right to a unanimous jury and fair trial. In short, there is no reason to believe the

11  court's use of CALJIC 17.41.1 played any role in the jury's deliberations.  Therefore, Petitioner

12  has failed to demonstrate any prejudice resulting from this instruction.

13         Moreover, Petitioner has failed to establish a federal constitutional violation.  To date, the

14  Supreme Court has not held this instruction to be unconstitutional, and Petitioner does not point

15  to any Supreme Court authority which would bar the giving of this instruction.  The Ninth Circuit

16  addressed the instant claim in <u>Brewer v. Hall</u>, 378 F.3d 952, 957 (9th Cir.2004), and affirmed the

17  district court's denial of the same claim because there is no clearly established federal law

18  holding that CALJIC 17.41.1 violates an existing constitutional right.

19         Even assuming the trial court erred in giving CALJIC No. 17.41.1, any error was

20  harmless in this instance because, other than the two questions asked regarding the definition of

21  constructive possession, which indicates the jury was actively deliberating, there is no evidence

22  to support a finding that this instruction "had [a] substantial and injurious effect or influence in

23  determining the jury's verdict."  Accordingly, the rejection of this claim by the state courts was

24  neither contrary to or an unreasonable application of clearly established Federal law, nor an

25  unreasonable determination of the facts in light of the evidence presented, and the claim should

26  be denied. <u>See</u> 28 U.S.C. § 2254(d).

27  E.      <u>Violation of Prior Plea Agreement by Imposition of a Three Strikes Sentence</u>

28         Petitioner contends that his prior convictions which were the product of a plea bargain

1  should not be used against him to impose a Three Strikes sentence.  Petitioner presented this

2  claim on collateral review to the California Supreme Court via state petition for writ of habeas

3  corpus, which was denied without comment.  As with the preceding claims, this Court looks

4  through that opinion, to the last reasoned state opinion of the state appellate court which denied

5  the petition stating:

6          The "Petition For Writ Of Habeas Corpus," filed in this court on February
        6, 2006, is denied.  Petitioner has failed to provide any record of the plea
7       agreements in his prior convictions.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)
        Petitioner has failed to provide a declaration under penalty of perjury stating the
8       specific terms of said plea agreements.

9  (Lodged Doc. No. 10.)

10        As with the state court filing, Petitioner has failed to provide any documentation

11 substantiating the terms of his prior plea agreements.  Petitioner contends that he requested such

12 documentation but never received it.  Instead, Petitioner submits copies of transcripts from two

13 other cases which he claims supports his contention that the sentencing court must advise that a

14 prior conviction may be used as a future enhancement upon a subsequent conviction.  Petitioner

15 states that he obtained the transcripts from the website www.realisticreform.com. However, as

16 Respondent correctly points out, these transcripts are irrelevant to Petitioner's claim here because

17 they involve other unrelated individuals, not Petitioner.

18        When a plea agreement rests in any significant degree on a promise or agreement of the

19 prosecutor, so that it can be said to be a part of the inducement or consideration, such promise

20 must be fulfilled.  Santobello v. New York, 404 U.S. 257, 22 (1971).  Here, there is no indication

21 that any promise *not* to use the prior convictions was made during the plea negotiations, nor does

22 Petitioner make any such allegation.  Accordingly, as there is no basis for finding that such a

23 promise was included in the plea agreements, the agreements were not violated by virtue of the

24 current enhancement.  Moreover, the sentence imposed under Three Strikes is not additional

25 punishment for the prior convictions, but rather a stiffened penalty for the latest crimes.  See

26 Monge v. California, 524 U.S. 721, 728 (1998).

27        To the extent that Petitioner alleges that he had no knowledge at the time of his prior

28 pleas of the possibility that it could later be used to enhance a sentence, his claim must also fail.

1   Due process requires that a defendant be informed of all the *direct* consequences of a guilty plea.

2   Brady v. United States, 397 U.S. 742, 749 (1970).  There is no due process violation where a trial

3   court fails to inform the defendant of *collateral* consequences, such as the potential for

4   enhancement in the future.  United States v. Garrett, 680 F.2d 64, 65-66 (9th Cir. 1982).  Thus,

5   Petitioner's lack of knowledge that his prior convictions could later be used to enhance a future

6   sentence does not violate due process.

7          In addition, to the extent Petitioner contends that his prior convictions are not valid, such

8   claim is not cognizable in this forum.  In Lackawanna County District Attorney v. Coss, 532 U.S.

9   394 (2001), the Court held that "once a state conviction is no longer open to direct or collateral

10  attack in its own right because the defendant failed to pursue those remedies while they were

11  available (or because the defendant did so unsuccessfully), the conviction may be regarded as

12  conclusively valid. . . . If that conviction is later used to enhance a criminal sentence, the

13  defendant generally may not challenge the enhanced sentence through a petition under § 2254 on

14  the ground that the prior conviction was unconstitutionally obtained."  Id. at 403-404.  The only

15  exception to this rule is a challenge to a prior conviction that was obtained without the benefit of

16  counsel in violation of the Sixth Amendment.  Id. at 404.  Petitioner makes no such claim here,

17  and therefore cannot challenge the validity of his prior convictions as they are presumed to be

18  valid.

19                                    RECOMMENDATION

20         Based on the foregoing, it is HEREBY RECOMMENDED that:

21         1.      The instant petition for writ of habeas corpus be DENIED; and,

22         2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

23         This Findings and Recommendation is submitted to the assigned United States District

24  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

25  the Local Rules of Practice for the United States District Court, Eastern District of California.

26  Within thirty (30) days after being served with a copy, any party may file written objections with

27  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

28  Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

1   and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

2   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

3   636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

4   may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

5   Cir. 1991).

6

7          IT IS SO ORDERED.

8      **Dated:   June 26, 2008**                    **/s/ Dennis L. Beck**
                                         UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28